UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

| | | |
|---|---|---|
| **NICOLE EVERETT AND DANIEL DUGAY** | ) | **CIVIL ACTION** |
|    **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **HOFFMAN OF ALBANY TURNPIKE, INC d/b/a.** | ) | |
| **HOFFMAN NISSAN, NISSAN NORTH** | ) | |
| **AMERICA, INC., AND NISSAN MOTOR** | ) | |
| **ACCEPTANCE CORPORATION** | ) | |
|    **Defendants** | ) | |
| _____) | | **NOVEMBER 30, 2012** |

## COMPLAINT

1.  This is a suit brought by consumers under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.,* and Article 2 of the Uniform Commercial Code, Conn. Gen. Stat. §§ 42a-2-101 *et seq.* ("UCC"), the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. 1691 *et seq.,* and the Truth In Lending Act, 15 U.S.C. 1601 ("TILA") *et seq.* against Hoffman of Albany Turnpike, Inc. ("Hoffman"), a car dealership that fraudulently and maliciously sold them a 2011 Nissan Altima (the "Vehicle") under the description of "a Carfax One Owner" and "Certified Pre-Owned" ("CPO"), even though the Vehicle had previously been used as a rental Vehicle and was not in merchantable condition.  Plaintiffs also assert claims against Nissan North America, Inc. ("Nissan"), the manufacturer of the Vehicle and supervisor of the Nissan CPO program, pursuant to MMWA for providing to Plaintiffs at the time of sale an express warranty that the Vehicle was "Nissan Certified Pre-Owned" and for falsely misrepresenting that CPO vehicles were of higher quality than other comparable used vehicles, and for its failure to ensure that its dealerships properly handle the certification process.  Plaintiffs also

assert pendent state law claims against Hoffman and Nissan for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.,* and against Hoffman for violation of the Connecticut Retail Installment Sales Finance Act ("RISFA"), Conn. Gen. Stat § 36a-770 *et seq.* Furthermore, Plaintiffs assert claims against Nissan Motor Acceptance Corp. ("NMAC"), the assignee of the retail installment sales contract, for Hoffman's breaches of warranty, and seek revocation of acceptance of the Vehicle, or, alternatively, rescission of the contract based on Hoffman's violations of the Connecticut Retail Installment Sales Finance Act ("RISFA").

2.  Plaintiff, Nicole Everett ("Everett"), is a consumer residing in Manchester, Connecticut, is the daughter of Plaintiff Daniel Dugay, and is a "consumer" as that term is defined in §2301(3) of MMWA.

3.  Plaintiff, Daniel Dugay ("Dugay"), is a consumer residing in Virginia Beach, Virginia, is the father of Plaintiff Everett, and is a "consumer" as that term is defined in §2301(3) of MMWA.

4.  Defendant Hoffman is a Connecticut corporation that operates a motor vehicle dealership in West Simsbury, Connecticut.   It is an authorized dealership for Nissan and is a warrantor, as that term is defined in §2301(5) of MMWA.

5.  Defendant Nissan is a California corporation with its principal offices in Franklin, Tennessee, and coordinates the design, manufacture and marketing of Nissan vehicles in North America.  Nissan is a "warrantor" as that term is defined in §2301(5) of MMWA.

6.  Defendant NMAC is a California corporation that accepts the assignment of retail installment sales contracts from Nissan dealerships.

7.   Jurisdiction in this court is proper pursuant to 15 U.S.C. § 1691e, 15 U.S.C. 1640(e), 15 U.S.C. § 2310(d)(1)(B) and 28 U.S.C. 1367.

8.   Plaintiffs assert claims that Hoffman and Nissan engaged in willful and tortuous breaches of warranty that entitle them to claim common law punitive damages, which are based upon the attorney's fees incurred by them and which are expected to exceed $50,000, thereby satisfying the jurisdictional amount of Magnuson-Moss.

9.   This Court has jurisdiction over Hoffman because it is located in Connecticut and regularly does business in Connecticut, and this Court has jurisdiction over Nissan and NMAC because they regularly conduct business in Connecticut.

10.  Venue in this Court is proper, because the transaction alleged herein occurred in this state.

11.  On or around June 23, 2012, Everett visited Hoffman's website and searched for all Nissan Altimas.

12.  One of the vehicles that Everett saw advertised on Hoffman's website was the Vehicle, which Hoffman described and advertised on the website as a "Carfax One Owner" vehicle.  The advertisement did not disclose that the Vehicle was a former rental car.

13.  Originally, Everett was not interested in the Vehicle, because she hoped to purchase a vehicle with a leather interior and a sunroof.

14.  That same day, on or around June 23, 2012, Everett visited Hoffman's dealership with the intent to look at other vehicles.

15.  After arriving at Hoffman, Everett learned that a vehicle with a leather interior and sunroof was out of her budget.  Hoffman loaned her another vehicle to test drive for the weekend, and Everett completed and submitted a credit application for financing.

16.   On or around June 25, 2012, Everett returned to Hoffman and returned the loaned vehicle.  At this time, Carmen Mazzarella ("Mazzarella"), a Hoffman sales associate, told Everett that her credit had been approved to purchase the loaned vehicle.

17.  Everett had decided against purchasing the loaned vehicle, however, and left Hoffman intending to purchase a vehicle from another dealer.

18.  Shortly after June 25, 2012, Everett was contacted by Hoffman, and Hoffman requested that she return to the dealership to look at other used vehicles.

19.  Everett returned to Hoffman on June 30, 2012 and met with Mazzarella.

20.  Shortly after her arrival, Mazzarella presented the Vehicle to Everett, who recalled having seen it advertised as a "Carfax one owner" vehicle on Hoffman's website.

21.  Mazzarella also told Everett that the Vehicle was "certified pre-owned," ("CPO") and that, as part of the CPO process, the Vehicle had been through a multi-point inspection, was up to date on service, and had a limited power train warranty.

22.  Everett test drove the Vehicle on the route specified by Hoffman but did not take the Vehicle up to highway speed due to the distance of the highway from the dealership.

23.  Upon returning to the dealership, Everett agreed to purchase the Vehicle.

24. After Everett agreed to purchase the Vehicle, and despite having told her that her credit had been approved to purchase a more expensive vehicle earlier that week, Mazzarella told Everett that he could not get her approved for financing without a cosigner.

25. Everett was not provided with written notice of the reason(s) for the denial of her credit within 30 days of Hoffman's adverse action on her application, as required by ECOA.

26. Believing that she could not be approved without a cosigner, Everett contacted Dugay, who agreed to cosign for the Vehicle.  Dugay provided his credit information to Hoffman over the phone.

27. At this time, Mazzarella took Everett to Hoffman's finance manager, where Everett was presented with the Retail Installment Sales Contract ("RISC").

28. The RISC stated that the cash price of the Vehicle was $17,208.00, that the Annual Percentage Rate ("APR") was 7.99%, and that there would be 72 monthly payments of $315.43.

29. Even though Plaintiffs had intended to purchase the Vehicle for Everett's exclusive use and intended that Everett be primarily obligated on the underlying debt, and notwithstanding Mazzarella's characterization that Dugay would be a "cosigner", the RISC listed Dugay as the primary purchaser.

30. The RISC provided that Hoffman would pay $7,375.00 to Connex Credit Union to pay off Everett's trade-in vehicle, which had an allowed value of $9,500, with the net allowance of $2,125 being credited as a down payment on the Vehicle.

31.  Also in connection with the Purchase of the Vehicle, Hoffman presented Everett with a Purchase Order that stated "This motor vehicle is guaranteed for 60 days or 3,000 miles, whichever comes first.  The retailer will pay 100% of the parts and 100% of the labor for covered parts for the covered systems during the warranty period."

32.  At the time Everett signed the RISC and other purchase documents, she was told that she could not get copies of the papers until they were signed by Dugay.  Hoffman told Everett that the paperwork would be sent to Dugay by Federal Express for signing.

33.  When Everett finally left Hoffman around 5:00 PM on June 30, 2012, the only paperwork she was given regarding the Vehicle was an "Odometer Disclosure Statement" and a form entitled "We Owe."

34.  Everett was also not given a registration certificate, and she was told that she would need to drive the Vehicle on Hoffman's dealer plates.

35.  The next morning, on or around July 1, 2012, Everett drove the Vehicle and noticed a vibration when applying the brakes and a shimmy in the steering wheel and gas pedal.

36.  The next day, Everett contacted Hoffman from work and reported the problems.

37.  On or around July 2, 2012, Everett brought the Vehicle to Hoffman to be repaired.

38.  Among the problems reported by Everett were the shimmy in the steering wheel, the vibration, and the malfunction of the air conditioning system.

39. Although Hoffman represented that it had repaired Plaintiffs' complaints, the aforementioned defects, as well as others, continued to persist following the service appointment.

40. Between July 2, 2012 and October 1, 2012, the Vehicle was brought to Hoffman for more than 10 service appointments. During these service appointments, Everett was told that the Vehicle's tires were replaced, the rotors were resurfaced, the wheel bearings were replaced, a "factory re-learn" was performed, and the Vehicle was aligned multiple times.  Additionally, Everett directed Hoffman to diagnose a malfunctioning passenger airbag light, but Hoffman claimed it did not malfunction while in Hoffman's possession.

41. Despite these repair attempts, the Vehicle continued to vibrate at highway speeds, the Passenger air bag light did not function properly, the Vehicle will not hold a proper alignment, and the steering wheel continued to shimmy.

42. Additionally, at the time of sale, Everett was promised a full detail cleaning of the Vehicle.  However, Everett had to return multiple times to Hoffman to have the vehicle cleaned because Hoffman's work was unsatisfactory.  When Everett complained to Mazzarella about the unsatisfactory detail, he promised to personally detail the Vehicle, but failed to do so.

43. Also during the month of July 2012, Everett made several attempts to obtain her registration certificate from Hoffman, but was unsuccessful.

44. On multiple occasions Everett returned to Hoffman—which was approximately a one-hour drive for her - in order to obtain her registration, but was told that the paperwork was unavailable and was turned away.

45. Despite her multiple requests, Everett did not receive her registration until over two weeks after she purchased the Vehicle.

46. Plaintiffs were also unable to obtain a copy of the completed purchase paperwork following the sale.

47. Despite multiple requests for a copy of the RISC and other documents, Plaintiffs were not provided with a copy of the RISC until over two months after the transaction.

48. Because Plaintiffs had not received a copy of the RISC, they did not know where to send their first payment or when it was due, and they were late on their first monthly installment payment.

49. Hoffman also failed to timely pay off the balance on Everett's trade-in Vehicle, causing her credit report to reflect a past-due balance of $120.76 that was reported as over 30 days late.

50. Also following the sale, Everett made several requests for a copy of the Vehicle's Carfax report, but Hoffman failed to provide her with a copy.

51. Upon information and belief, Hoffman failed and refused to provide Everett with a copy of the Carfax report, even though Nissan's CPO program includes the provision of such a report, because it did not want her to learn of the Vehicle's history as a former rental car.

52. Eventually, Everett was provided with a copy of the Carfax report, and she learned that the Vehicle had been previously used as a rental vehicle.

53. Prior to obtaining this Carfax report, Plaintiffs were not informed of the Vehicle's prior history as a rental vehicle, and, in fact, Everett specifically told Hoffman prior to June 30, 2012 that she was not interested in purchasing a former rental Vehicle.

54. Hoffman did not disclose in its advertising of the Vehicle on its website that it was a former rental vehicle, even though the inclusion of that information is required under Conn. Gen. Stat. Agency Reg. § 42-110b-28(B)(1)(C).

55. The Vehicle is a consumer product as that term is defined in §2301(1) of the Magnuson-Moss Federal Warranty Act (15 U.S.C. §§ 2301-2312).

56. The Vehicle, as sold to Plaintiffs, would not pass in trade under the description of a "Certified Pre-Owned 2011 Nissan Altima."

57. The Vehicle, as sold to Plaintiffs, would not pass in trade under the description of a "Carfax One-Owner" Vehicle.

58. It is not possible for Hoffman to cure the breach of implied warranty of merchantability or Plaintiffs provided Hoffman with a reasonable opportunity to cure the breach of implied warranty but it has not done so or both.

59. The Vehicle's status as a former rental Vehicle substantially impaired the value of the Vehicle to Plaintiffs, entitling them to revoke acceptance of the Vehicle.

60. The Vehicle's continued mechanical defects substantially impaired the value of the Vehicle to Plaintiffs, entitling them to revoke acceptance of the Vehicle.

61. On or around October 9, 2012, Plaintiffs notified Hoffman and NMAC in writing of their claims and of their revocation of acceptance.

62. Hoffman's breaches of the implied warranty of merchantability were tortious in nature, in bad faith, were wanton and malicious, outrageous, and were undertaken

with bad motive and with a reckless indifference to Plaintiffs' interests and the injury that they sustained.  Plaintiffs are entitled to their damages, consequential damages, and common law punitive damages for the tortious breach of the implied warranty of merchantability.

63. Plaintiffs estimate, and accordingly allege, that the total amount that will be sought at trial for common law punitive damages will exceed $50,000.

64. As a result of the above-described actions, Hoffman is liable to Plaintiffs for their damages, reasonable attorney's fees, and costs pursuant to §2310(d) of Magnuson-Moss.

65. Hoffman made affirmations of fact or promise relating to the Vehicle that became part of the basis of the bargain and that created express warranties pursuant to Conn. Gen. Stat. § 42a-2-313(a).  Specifically, Hoffman represented that the Vehicle, as a CPO vehicle, had previously undergone the necessary inspections and met the requisite criteria to be designated as a "Nissan Certified Pre-Owned" vehicle, and that the Vehicle, as a "Carfax One-Owner" Vehicle, had been owned and driven by one individual.

66. Further, the advertising of the Vehicle as a "Nissan Certified Pre-Owned" vehicle and/or a "Carfax One-Owner" Vehicle constituted a description of the Vehicle that was part of the basis of the bargain, thereby creating an express warranty that the Vehicle conformed to that description.

67. Additionally, Hoffman's representations in the Purchase Order that the Vehicle was guaranteed for 60 days or 3,000 miles, and that it would cover the cost of all necessary parts and labor during the warranty was an affirmation of fact or promise

relating to the Vehicle that became part of the basis of the bargain and created express warranties pursuant to Conn. Gen. Stat. § 42a-2-313(a).

68.  The Vehicle had not undergone the necessary inspections and did not meet the requirements to be a "Nissan Certified Pre-Owned" vehicle and the Vehicle did not conform to that description.

69.  The Vehicle was not, in fact, a one-owner Vehicle as Plaintiffs had expected and requested, but was a former rental vehicle.

70.  Further, despite being provided with a reasonable number of opportunities to repair the Vehicle, Hoffman failed to adequately remedy the Vehicle's defects within the 60-day, 3,000 mile warranty period, thereby breaching its express warranty to Plaintiffs.

71.  Hoffman's breach of the express warranties was tortious in nature, in bad faith, was wanton and malicious, outrageous, and was undertaken with bad motive and with a reckless indifference to Plaintiffs' interests and the injury that they sustained.

72.  Plaintiffs are entitled to their damages, consequential damages, and common law punitive damages for the tortious breach of the express warranty.

73.  Plaintiffs estimate, and accordingly allege, that the total amount that will be sought at trial for common law punitive damages will exceed $50,000.

74.  As a result of Hoffman's breach of express warranty, Plaintiffs are entitled to reasonable attorney's fees, and costs pursuant to §2310(d) of Magnuson-Moss.

75.  Through its failure to provide Plaintiffs with a copy of the RISC at the time of the document's signing, its failure to timely register the Vehicle, and its failure to timely pay-off the trade-in vehicle, Hoffman violated TILA and RISFA.

76. For Hoffman's violations of TILA, Plaintiffs are entitled to their actual damages, statutory damages and attorney's fees and costs.

77. Through its aforementioned violations of TILA Hoffman also violated RISFA, which expressly incorporates the TILA's disclosure requirements.

78. Hoffman also violated RISFA by its failure to provide Plaintiffs with a copy of the RISC at the time of the document's signing.

79. For Hoffman's violations of RISFA, Plaintiffs are entitled to rescission of the contract.

80. Through its failure to provide Everett with written notice of the reason(s) for its adverse action on her credit application, Hoffman violated ECOA § 1691(d).

81. For Hoffman's violations of ECOA, Everett is entitled to damages, punitive damages of up to $10,000, plus attorney's fees and costs.

82. Through its above-described actions, Hoffman also violated CUTPA.

83. Specifically, failing to timely pay off the loan on the trade-in vehicle, failure to adequately repair the Vehicle, failure to honor its promises to Plaintiffs, misrepresenting the Vehicle's condition, history, and its suitability for inclusion as a CPO vehicle, and failing to provide Plaintiffs with a copy of the RISC until two months after the transaction, are unfair and/or deceptive practices within the meaning of CUTPA, and failing to disclose the Vehicle's history as a rental vehicle in the advertisement of the Vehicle violated Conn. Agencies Reg. § 42-110b-28(b)(2)(C), which amounts to a *per se* violation of CUTPA.

84. As a result of Hoffman's conduct, Plaintiffs suffered an ascertainable loss, including, but not limited to, negative credit reporting, the purchase of a Vehicle that

they did not desire and the value of which was substantially impaired to them, loss of

the benefit of their bargain, additional repair costs, lost use of the Vehicle, additional

mileage on the Vehicle traveling to and from service appointments, depravation of

information to which Plaintiffs were legally entitled and lost wages due to Everett having

to leave work early on numerous occasions for service appointments.

85. Under the terms of the Contract, NMAC is liable to Plaintiffs for the breaches

of express and implied warranties by Hoffman, limited to the amounts paid under the

Contract, and, because Hoffman was notified of Plaintiffs' claims, its liability is extended

to include the unpaid balance of the Contract pursuant to Conn. Gen. Stat. § 52-572g.

86. Additionally, NMAC is liable for actual damages plus additional damages of

up to $1,000 under the Connecticut Creditor Collection Practices Act, Conn. Gen. Stat.

§ 36a-648, for falsely and deceptively informing Everett that because it was just the

assignee of the account, it is not subject to claims and defenses against Hoffman, a

violation of Conn. Agency Reg. § 36a-647-6(13).

87. Nissan advertises and promotes its CPO vehicles in order to promote a

market for used Nissan vehicles, and it permits car dealerships to handle the

certification process as its agents.

88. Nissan made affirmations of fact or promise relating to the used Vehicle

certification process that became part of the basis of the bargain and that created

express warranties pursuant to Conn. Gen. Stat. § 42a-2-313(a).

89. Specifically, Nissan's CPO website states that "Every Certified Pre-Owned

Nissan must meet or exceed our comprehensive criteria and pass our rigorous

inspection. Your peace of mind comes from our attention to detail, including:

Comprehensive 150+ point vehicle inspection, CARFAX® Vehicle History Report™,

Genuine Nissan parts, Nissan service history review, Nissan trained technicians."

90. Further, Nissan's CPO advertising brochure states "Take all the things that

make a Nissan a great new vehicle – the style, the performance, the features.  Add in

the confidence of a thorough inspection, a CARFAX® Vehicle History Report and a

comprehensive warranty and protection plan. Top it off with significant savings from

new, without the concerns you'd find with a typical used car. And if you want your

friends to think you went out and bought a new Nissan, your secret's safe with us."

91. Nissan's advertisements and website give the impression that Nissan is

directly involved in certifying the fitness of the certified cars and that a "Nissan Certified

Pre-Owned" vehicle is more valuable and more dependable because of the

standardized certification process which is represented to be overseen by Nissan.

92. In reality, the certification process is conducted by its dealerships without

meaningful oversight by Nissan.

93. The advertising of the value, dependability and like-new quality of Nissan

CPO vehicles constituted a description of the Vehicle that was part of the basis of the

bargain, thereby creating an express warranty that the Vehicle conformed to that

description.

94. Nissan did not ensure that the Vehicle had not undergone the necessary

inspections to meet the requirements to be a Nissan CPO vehicle and the Vehicle did

not conform to that description, notwithstanding that Nissan had knowledge that its

dealerships did not consistently and reliably following the certification guidelines.

95.  Nissan's breach of the express warranties was tortious in nature, in bad faith, was wanton and malicious, outrageous, and was undertaken with bad motive and with a reckless indifference to Plaintiffs' interests and the injury that they sustained.

96.  Plaintiffs are entitled to their damages, consequential damages, and common law punitive damages for the tortious breach of the express warranty.

97.  As a result of Nissan's breach of express warranty, Plaintiffs are entitled to reasonable attorney's fees, and costs pursuant to §2310(d) of Magnuson-Moss.

98.  Through its above-described actions, Nissan also violated CUTPA.

99.  As a result of Nissan's conduct, Plaintiffs suffered an ascertainable loss, including, but not limited to, purchase of a Vehicle that they were made to  believe was reliable and of like-new quality.

100.   For Nissan's violations of CUTPA, Plaintiffs are entitled to their damages, plus punitive damages and a reasonable attorney's fee.

**Wherefore, Plaintiffs claim**, actual money damages pursuant to 15 U.S.C. §1691e(a), punitive damages of $10,000 pursuant to 15 U.S.C. §1691e(b), and attorney's fees and costs of this action pursuant to 15 U.S.C. §1691e(d); actual damages pursuant to 15 U.S.C. § 1640(a)(1), statutory damages of $2,000, plus a reasonable attorney's fee pursuant to 15 U.S.C. § 1640(a)(3); statutory damages pursuant to C.G.S. § 36a-787; damages pursuant to C.G.S. § 42a-2-714; damages, reasonable attorney's fees, and costs pursuant to 15 U.S.C. § 2310(d); statutory punitive damages pursuant to C.G.S. § 42-110g(a); attorney's fees pursuant to C.G.S. § 42-110g(d); revocation of acceptance or, alternatively, an order declaring that the contract is rescinded and directing return of all moneys paid to Plaintiffs; an order from the Court permitting Plaintiffs to sell the Vehicle and to apply the proceeds to any damages awarded by the Court; an order from the Court ordering Hoffman to cease and desist from engaging in unfair and deceptive trade practices, including the failure to include rental history in advertisements; actual damages, statutory damages of up to $1,000, plus attorney's fees against NMAC pursuant to Conn. Gen. Stat. § 36a-648;  and such other further relief to which Plaintiffs are, at law, or in equity and by statute, entitled to against Hoffman, Nissan and/or NMAC.

**PLAINTIFFS, NICOLE EVERETT AND DANIEL DUGAY**


By: /s/Daniel S. Blinn
    Daniel S. Blinn, ct02188
    dblinn@consumerlawgroup.com
    Consumer Law Group, LLC
    35 Cold Spring Rd. Suite 512
    Rocky Hill, CT  06067
    Tel. (860) 571-0408; Fax (860) 571-7457